IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOSHUA L. GAGNON,                                    Case No. 6:15-cv-00988-SB

        Plaintiff,                                **OPINION AND**
                                                    **ORDER**

    v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

---

**BECKERMAN, Magistrate Judge.**

Joshua Gagnon ("Gagnon") brings this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of his applications for Social Security disability insurance benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the Commissioner's decision is reversed and remanded for an award of benefits.

Page 1 - OPINION AND ORDER

## I. FACTS AND PROCEDURAL HISTORY

Gagnon was born in July 1975, making him thirty-three years old on January 1, 2009, the amended alleged disability onset date. Gagnon has a high school education, and his past relevant work experience includes time as a bouncer, materials handler, laborer, furniture mover, recreational vehicle assembler, and "snow maker." (Tr. 23.) Gagnon alleges that he is unable to work due primarily to an anxiety disorder. (Tr. 41-42.)

On June 22, 2011, Gagnon was referred to Dr. Todd Lewis ("Dr. Lewis") for an orthopedic evaluation. Gagnon reported that he suffers from rheumatoid arthritis and diffuse joint pains, but could afford only over-the-counter medications to treat the conditions. Based on his orthopedic evaluation, Dr. Lewis concluded that Gagnon "has limited motions and stigmata" due to rheumatoid arthritis and a "very high pain threshold." (Tr. 485.) Dr. Lewis also stated that Gagnon exhibited "signs of bilateral upper extremity nerve irritation symptoms in the ulnar and median nerve." (Tr. 485.)

On June 24, 2011, Gagnon was referred to Dr. Gale Smolen ("Dr. Smolen") for a psychiatric evaluation. During the evaluation, Gagnon reported that he was divorced, currently living with his girlfriend and her four-year-old daughter (as well as his own son and his girlfriend's three other children, ranging in ages from eleven to seventeen, every other weekend), and using marijuana "several times a day some days" to treat pain stemming from a diagnosis of rheumatoid arthritis. (Tr. 487.) Gagnon further reported that he "helps with the housework" when "nobody is around" the house, that he washes the dishes twice a week, that he "does the majority of the yard work," that he does his own shopping during less busy times of the day, and that "[t]here is nothing he does not do." (Tr. 487.) In terms of mental impairments, Gagnon stated that he is depressed about eighty percent

Page 2 - OPINION AND ORDER

of the time, has panic attacks when he goes out into social settings, and has flashbacks to childhood abuse.

Upon examination, Dr. Smolen observed that Gagnon's remote memory was considered intact, he was able to follow a three-step command, and he "did Serial Sevens with two errors down to the 50's."[1] (Tr. 489.) Dr. Smolen's diagnoses were: posttraumatic stress disorder, major depressive disorder, panic attacks with agoraphobia (Axis I); rheumatoid arthritis, constant back pain, and sleep apnea (Axis III), and coping with mental and physical problems and "living in an active household with five kids every other weekend" (Axis IV). (Tr. 489.) Dr. Smolen concluded that Gagnon should be "able to remember and understand with mild impairment due to anxiety and concentrate and attend with the same," and that he "would be able to get along well with people at this time[.]" (Tr. 489.)

On October 10, 2011, Gagnon visited Dr. James Phelps ("Dr. Phelps"), a psychiatrist at Community Outreach, Inc., a free health clinic located in Corvallis, Oregon. Gagnon informed Dr. Phelps that he was suffering from anxiety and depression, and that he smoked marijuana twice a week to cope with the pain stemming from his rheumatoid arthritis. Dr. Phelps noted that Gagnon appeared very anxious and exhibited poor eye contact, and he provided Gagnon a prescription for Zyprexa. When Gagnon presented for a follow-up visit later that month, he stated that Zyprexa had "helped a lot." (Tr. 295.) Gagnon made similar reports about Dr. Phelps' prescription of Lithium, in December 2011: "The patient said that Lithium has been helpful for anxiety/depression[.]" (Tr. 289.)

---

[1] "Serial sevens are a diagnostic test in which the patient performs serial subtraction of sevens from one hundred. It is often used to assess mental status." *Rockett v. Astrue*, No. 10-0163, 2011 WL 4353126, at *8 n.28 (S.D. Cal. Aug. 16, 2011).

On January 30, 2012, Gagnon returned to Dr. Phelps' office, complaining of pain in his left groin. Gagnon stated that it felt like he had "been kicked." (Tr. 288.) Dr. Phelps' clinical impression was a likely hernia, and he recommended that Gagnon apply for special assistance at the local hospital. A pelvic ultrasound obtained on February 14, 2012, was consistent with Dr. Phelps' diagnosis: "There appears to be at least a moderate-sized hernia in the left inguinal region." (Tr. 287.)

On March 16, 2012, Gagnon informed Dr. Phelps that his prescription medications were no longer effective, and that his girlfriend felt that he was being an "asshole again." (Tr. 283.) Dr. Phelps responded by altering Gagnon's medications and dosage levels. By April 20, 2012, Dr. Phelps noted that it "look[ed] like" Gagnon's condition had improved. (Tr. 281.) Similarly, on May 4, 2012, Dr. Phelps noted that Gagnon's mood had stabilized and Gagnon's depression was "now steady." (Tr. 278.)

On May 13, 2012, Gagnon's mother, Margaret Neel ("Neel"), completed a third-party adult function report in support of her son's applications for benefits.[2] Neel stated that Gagnon resides at her home; suffers from arthritis, severe depression, and an inability to tolerate crowds and complex instructions; typically watches television, listens to music, eats, smokes cigarettes, takes medications, and goes on long walks each day; needs to be reminded to shower; and can cook, perform light house cleaning, laundry, and repairs around the house. Neel added that Gagnon's impairments negatively

---

[2] Gagnon completed an adult function report on May 16, 2012, which largely tracks the contents of his mother's report. Gagnon's sister, Margie Chambers ("Chambers"), ex-wife, Amy Gagnon ("Ms. Gagnon"), and friend, Steve Barnes ("Barnes"), also submitted written statements in support of Gagnon's applications, indicating that Gagnon suffers from arthritis and severe anxiety manifested by isolating behavior, and that they do not believe Gagnon could sustain full-time employment.

impact his ability to lift, squat, bend, stand, reach, kneel, climb stairs, retain information, complete tasks, concentrate, comprehend information, follow instructions, use his hands, and get along with others.

Dr. Sandra Lundblad ("Dr. Lundblad"), a non-examining state agency psychologist, completed a psychiatric review technique assessment on July 3, 2012, wherein she evaluated Gagnon's impairments under listings 12.04 (affective disorders), 12.06 (anxiety disorders), and 12.09 (substance addiction disorders). Based on her review of the medical records in Gagnon's file, Dr. Lundblad concluded that the limitations imposed by Gagnon's impairments failed to satisfy the above listings.

That same day, July 3, 2012, Dr. Lundblad also completed a mental residual functional capacity assessment, which described Gagnon as moderately limited in four of sixteen categories of mental activity and not significantly limited in twelve. Dr. Lundblad added that Gagnon should be limited to simple one- to two-step commands in the workplace, infrequent contact with the general public, occasional interaction with co-workers, and less than "constant contact with the supervisor." (Tr. 88.)

Also on July 3, 2012, Dr. Martin Kehrli ("Dr. Kehrli"), a non-examining state agency physician, completed a physical residual functional capacity assessment. Dr. Kehrli found that Gagnon could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for up to six hours in an eight-hour workday; sit for up to six hours in an eight-hour workday; push and pull in accordance with the lift and carry restriction; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. Dr. Kehrli further concluded

that Gagnon was not suffering from manipulative, visual, communicative, or environmental limitations.

Gagnon returned to Dr. Phelps' office on September 7, 2012. Gagnon reported that he was doing "good" as long as he stayed inside, and that he was "definitely more stable" while home alone. (Tr. 272.) Dr. Phelps observed that Gagnon's current level of functioning "may be as good as [he] can get him," and noted that Gagnon needed "long-term exposure" therapy for posttraumatic stress disorder, which is a form of treatment that Community Outreach, Inc. could not offer to Gagnon. (Tr. 272.)

Two weeks later, on September 21, 2012, Dr. Phelps drafted a letter to the Social Security Administration on Gagnon's behalf. Dr. Phelps' letter stated that he "rarely" writes in support of disability applications but felt compelled to do so here, because he "tried multiple strategies and had only moderate success," and because Gagnon "continues to be extremely impaired by anxiety." (Tr. 297.) Dr. Phelps added that he believes Gagnon would return to work if his condition were treated successfully.[3]

On November 2, 2012, Dr. Linda Jensen ("Dr. Jensen"), a non-examining state agency physician, completed a second physical residual functional capacity assessment. Like Dr. Kehrli, Dr. Jensen found that Gagnon could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for up to six hours in an eight-hour workday; sit for up to six hours in an eight-hour workday; push and pull in accordance with the lift and carry restriction; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. Dr. Jensen also

---

[3] In a prescription note dated June 1, 2012, Dr. Phelps similarly stated that Gagnon is "definitely unable to work." (Tr. 309.)

agreed with Dr. Kehrli that Gagnon did not suffer from visual, communicative, or environmental limitations, but disagreed with respect to manipulative limitations, finding limitations in overhead reaching.

On November 21, 2012, Gagnon was referred to Dr. Smolen for a second psychiatric evaluation. Upon examination, Dr. Smolen observed that Gagnon's remote memory, insight into his illness, and basic judgment were intact, that Gagnon was able to name the last five presidents of the United States, and that Gagnon "did Serial Sevens with two errors down to the 50's." (Tr. 301.) Dr. Smolen's diagnoses were: bipolar disorder, posttraumatic stress disorder, panic attacks with agoraphobia, and marijuana dependence (Axis I); rheumatoid arthritis, back pain, and sleep apnea (Axis III); and a very restricted lifestyle and difficulty coping with physical and mental stressors (Axis IV). Dr. Smolen further stated that Gagnon's "concentration was mildly impaired," and that Gagnon "is able to remember and understand with mild to moderate impairment due to anxiety." (Tr. 302.)

Dr. Joshua Boyd ("Dr. Boyd"), a non-examining state agency psychologist, completed a second psychiatric review technique assessment on December 11, 2012, wherein he evaluated Gagnon's impairments under listings 12.04 (affective disorders), 12.06 (anxiety disorders), and 12.09 (substance addiction disorders). Based on his review of the medical records in Gagnon's file, Dr. Boyd agreed with Dr. Lundblad's assessment that Gagnon's impairments failed to satisfy the above listings.

That same day, December 11, 2012, Dr. Boyd completed a second mental residual functional capacity assessment, which described Gagnon as moderately limited in four of sixteen categories of mental activity and not significantly limited in twelve. Dr. Boyd agreed with Dr. Lundblad's opinion

Page 7 - OPINION AND ORDER

that Gagnon was capable of performing simple one- to two-step commands in the workplace, but found that Gagnon should have no contact with the public and only brief, structured interaction with co-workers.

On August 2, 2013, Dr. Phelps drafted a second letter to the Social Security Administration on Gagnon's behalf. Dr. Phelps began by noting that he has treated Gagnon since 2011, and while the treatment notes from his volunteer work at Community Outreach Inc. are "necessarily brief," Dr. Phelps emphasized that his experience with Gagnon "is now quite extensive," meaning he "know[s] him well." (Tr. 308.) Dr. Phelps reiterated that Gagnon "is undoubtedly severely impaired by his symptoms, which compromise his ability to function almost completely." (Tr. 308.) Dr. Phelps added that Gagnon had an adverse liver reaction to a medication that had helped decrease his symptoms, Gagnon was "far from being able to work" even "at his most improved," and Gagnon is now "living very close to a degree of symptoms for which [doctors] would usually consider hospitalization." (Tr. 308.)

An administrative law judge ("ALJ") convened a hearing on December 11, 2013, at which Gagnon testified about the limitations resulting from his impairments. Gagnon testified that he suffers primarily from anxiety that causes him to isolate himself and avoid public places, but has also been diagnosed with rheumatoid arthritis, sleep apnea, and a hernia; does not drive because his license was suspended due to back child support; lives with his mother, who also serves as his primary means of transportation; receives occasional visits from his teenage son, who lives with Gagnon's ex-wife; has a history of absenteeism in the workplace; and was hospitalized for ten days of mental health treatment in 2008. Gagnon further testified that he does not "feel like . . . a real person anymore . . . like [he's] watching something," and that he cannot "sit down and do anything"

due to impairments in concentration. (Tr. 42-43.) Gagnon also testified that he spends most of his time watching television and playing solitaire on the computer, and that his mother "writes [him] lists of stuff that needs to be done" in terms of household chores, laundry, cleaning, and meal preparation. (Tr. 45.)

The ALJ posed a series of questions to a vocational expert ("VE") who testified at Gagnon's hearing. The ALJ first asked the VE to assume that a hypothetical worker of Gagnon's age, education, and work experience could perform light work, subject to the following limitations: (1) the worker is limited to no more than occasional climbing, balancing, stooping, kneeling, crouching, crawling, and overhead reaching bilaterally; (2) the worker can perform only simple, repetitive, and routine tasks, which require no more than occasional interaction with supervisors and co-workers; and (3) the worker cannot have any contact with the general public. The VE testified that the hypothetical worker could be employed as a small products assembler II, electronics worker, and marker. The VE further testified that there were 225,632 small products assembler II jobs in the national economy, including 3,611 in Oregon, 227,477 electronics worker jobs in the national economy, including 3,511 in Oregon, and 218,174 marker jobs in the national economy, including 2,068 in Oregon.

The ALJ next asked the VE about the customary tolerances of employers with respect to tardiness, absenteeism, break periods, and being off-task. The VE testified that employers typically tolerate no more than two to three episodes of tardiness per month or one to two unexcused absences per month; that employees typically receive three break periods each workday, ranging from ten to fifteen minutes (the morning and afternoon breaks) to thirty to sixty minutes (the lunch break); and

that an employee would be terminated if they were off-task for more than ten percent of each workday.

Gagnon's attorney also posed a question to the VE. Specifically, Gagnon's attorney asked the VE to assume that a hypothetical worker of Gagnon's age, education, and work experience suffered from "marked limitations" in his ability to maintain attention and concentration for extended periods of time, accept instructions and respond appropriately to criticism from supervisors, and "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances." (Tr. 59.) Gagnon's attorney defined "marked limitations" as precluding functioning in the stated abilities fifteen "percent of the work time." (Tr. 59.) The VE confirmed that the limitations set forth in the hypothetical question would prevent the hypothetical worker from sustaining gainful employment.

On December 18, 2013, Dr. Phelps completed a third mental residual capacity assessment, which described Gagnon as severely limited in his ability to: (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods of time, (3) work in coordination with, or proximity to, others without being distracted, (4) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," (5) interact with the general public, (6) accept instructions and respond appropriately to criticism from supervisors," and (7) respond appropriately to changes in the work setting. (Tr. 387-89.) Dr. Phelps added that Gagnon is "one of the worst chronic anxiety cases [he has] ever seen with profoundly compromised abilities to . . . tolerate the presence of any other humans[,] . . . think through problems[,] . . . [and] focus attention." (Tr. 389.)

Page 10 - OPINION AND ORDER

In a written decision issued on January 16, 2014, the ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Gagnon was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Gagnon's petition for review, making the ALJ's decision the Commissioner's final decision. Gagnon timely appealed.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in

the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## B.    The ALJ's Decision

At the first step of the sequential process, the ALJ found that Gagnon had not engaged in substantial gainful activity since January 1, 2009, the amended alleged onset date. At the second step, the ALJ found that Gagnon had the severe impairments of: "history of rheumatoid arthritis; bipolar disorder; history of posttraumatic stress disorder; panic attacks with agoraphobia; and marijuana dependence." (Tr. 15.)

At the third step, the ALJ found that Gagnon's combination of impairments was not the equivalent of those on the Listing of Impairments.[4] The ALJ then assessed Gagnon's residual functional capacity ("RFC") and found that he could perform light work, as defined under 20 C.F.R. §§ 404.1567(b) and 416.967(b), subject to the following limitations: (1) Gagnon is limited to no more than occasional climbing, balancing, stooping, kneeling, crouching, crawling, and overhead reaching; (2) Gagnon can perform only simple, repetitive, and routine tasks, which require no more than occasional interaction with supervisors and co-workers; and (3) Gagnon should have no contact with the public.

At the fourth step, the ALJ concluded that Gagnon is unable to perform his past relevant work. At the fifth step, the ALJ concluded that there were other jobs existing in significant numbers

─────────────

[4] The Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

in the national economy that Gagnon could perform, such as a small products assembler II, electronics worker, and marker. Accordingly, the ALJ concluded that Gagnon had not been under a disability, as defined under the Social Security Act, since January 1, 2009, the amended alleged onset date.

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

///

///

# IV. DISCUSSION

In this appeal, Gagnon argues that the ALJ erred by failing to: (1) offer legally sufficient reasons for discrediting the opinions of his treating psychiatrist, Dr. Phelps; (2) offer specific, clear, and convincing reasons for discrediting Gagnon's subjective symptom testimony; and (3) account for all of Gagnon's credible limitations in formulating the RFC and VE hypothetical. As explained below, the Court concludes that the ALJ's rejection of Dr. Phelps' opinions was not supported by substantial evidence, that Gagnon satisfies all three conditions of the credit-as-true rule, and that a careful review of the record discloses no reason to seriously doubt that Gagnon is, in fact, disabled. The Court therefore reverses the Commissioner's decision and remands this case for an award of benefits.

## A.    Medical Opinion Evidence

### 1.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2001)). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions, however, is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

## 2.    Application of Law to Fact

Gagnon argues that the ALJ failed to offer legally sufficient reasons for discounting Dr. Phelps' opinions, in particular his opinion that Gagnon could not sustain full-time work. The Court agrees.

Dr. Phelps' mental residual functional capacity assessment dated December 18, 2013, conflicts with the mental residual functional capacity assessments completed by Drs. Lundblad and Boyd, neither of whom opined that Gagnon suffered from severe limitations in any of the enumerated categories of mental activity. Therefore, the ALJ needed to provide specific and legitimate reasons for discrediting Dr. Phelps' opinions. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"); *Killan v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killan's contention that the ALJ erred when he discounted her treating physician's

opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ failed to do so.

The ALJ offered two reasons for rejecting Dr. Phelps' opinions: (1) Dr. Phelps' treatment notes were inconsistent with the degree of limitation identified in his opinions; and (2) Gagnon's reported activities were inconsistent with the level of impairment identified by Dr. Phelps. Specific and legitimate reasons for discounting a treating doctor's testimony include conflicts with the doctor's own treatment notes, *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003), and conflicts with the claimant's reported activities, *Cagey v. Colvin*, No. 13-2219, 2014 WL 5449717, at *5 (W.D. Wash. Oct. 24, 2014) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999)). Here, however, there is not substantial evidence in the record to support the ALJ's conclusion that Dr. Phelps' opinions were inconsistent with his treatment notes or Gagnon's reported activities.

In many respects, this case parallels the Ninth Circuit's decision in *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014), where the ALJ similarly rejected medical opinions because they were inconsistent with treatment notes. On appeal, the Ninth Circuit concluded that the ALJ erred, observing that the treatment notes consistently reflected that the claimant "continued to experience severe symptoms, including ongoing depression and auditory hallucinations, difficulty sleeping, nightmares, and memory loss." *Id*. After acknowledging that the treatment notes showed some signs of improvement, the Ninth Circuit cautioned that "such observations must be 'read in context of the overall diagnostic picture' the provider draws." *Id*. at 1162 (citing, *inter alia*, *Holohan*, 246 F.3d at 1205)).

Page 16 - OPINION AND ORDER

It is true that the treatment notes indicated that Gagnon showed some signs of improvement. Examples of improvement include the following: (1) in late October 2011, Gagnon reported that Zyprexa had "helped a lot" in treating his mental impairments, (2) in December 2011, Gagnon stated that Lithium had proved to be helpful in treating his anxiety and depression, (3) in April 2012, Dr. Phelps noted that it "look[ed] like" Gagnon's condition had improved, and (4) in May 2012, Dr. Phelps noted that Gagnon's mood had stabilized and his depression was "now steady." (Tr. 278, 281, 289, 295.)

To give proper context to the above observations, however, one must consider the fact that: (1) on February 17, 2012, Dr. Phelps observed that Gagnon's anxiety had increased significantly and he was "isolating to cope," as evidenced by Gagnon "sitting at [the] far end of [the] waiting area," (2) on March 16, 2012, Dr. Phelps noted that prescription drugs "worked for a while [and] then seemed to stop" working, (3) on April 6, 2012, Dr. Phelps noted that Gagnon's condition was "still bad," Gagnon endorsed signs of passive suicidal ideation, and it was "like [Gagnon was] on no [medications], just like where we started," (4) on May 4, 2012, Dr. Phelps noted that Gagnon "still can't be around people" due to his anxiety and was having difficulty riding the bus, (5) on June 1, 2012, Dr. Phelps drafted a note stating that Gagnon "is definitely unable to work," (6) on September 7, 2012, Dr. Phelps stated that Gagnon's current level of functioning, which consisted predominantly of isolating behavior, might "be as good" as Dr. Phelps could "get him" without more intensive therapy that was not available at the free clinic, (7) on September 21, 2012, Dr. Phelps drafted a letter to the Social Security Administration on Gagnon's behalf, indicating that Gagnon "continued to be extremely impaired by anxiety," and Dr. Phelps "tried multiple strategies" with only moderate success, (8) on August 2, 2013, Dr. Phelps drafted a second letter in support of Gagnon's application,

emphasizing that the nature of his volunteer work meant that his treatment notes were "necessarily brief," his treating relationship with Gagnon is "quite extensive," Gagnon "is undoubtedly severely impaired by his symptoms, which compromise his ability to function almost completely," Gagnon is "far from being able to work" even "at his most improved," Gagnon had an adverse reaction to a medication that had helped decrease his symptoms, and Gagnon is "very close to a degree of symptoms for which [physicians] would usually consider hospitalization," and (9) Dr. Phelps completed a mental residual functional capacity assessment on December 18, 2013, which described Gagnon as severely limited in seven of twenty categories of mental activity, and stated that Gagnon is "one of the worst anxiety cases" Dr. Phelps has attempted to treat. (Tr. 272, 278, 282-83, 286, 297, 308-09, 387-89.)

The foregoing record evidence demonstrates that the ALJ failed to read Dr. Phelps' treatment notes in context of the overall diagnostic picture he drew. Indeed, the ALJ seemed to cherry-pick observations from Dr. Phelps' treatment notes that would support a finding of non-disability, while ignoring observations from Dr. Phelps' treatment notes that supported a disability finding and supported the opinions set forth in Dr. Phelps' medical source statements. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). Accordingly, the Court concludes that the ALJ erred in rejecting Dr. Phelps' opinions as inconsistent with his treatment notes. *Cf. Lester*, 81 F.3d at 833 ("Occasional symptom-free periods . . . are not inconsistent with disability."); *Holohan*, 246 F.3d at 1205 (explaining that the fact that a person suffering from a mental impairment makes some improvement

"does not mean that the person's impairment[] no longer seriously affect[s] her ability to function in the workplace").

The ALJ's reliance on Gagnon's reported activities to discredit Dr. Phelps' opinions is also misplaced. When assessing whether a claimant's reported activities are inconsistent with a treating provider's opinions, an ALJ or reviewing court must base such a determination on a holistic review of the record. *See Ghanim*, 763 F.3d at 1162 ("[A] holistic review of the record does not reveal an inconsistency between the treating providers' opinions and Ghanim's daily activities.") For example, in *Ghanim*, the record indicated that the claimant "performed some basic chores and occasionally socialized," but it also revealed that the claimant "relied heavily on his caretaker, struggled with social interactions, and limited himself to low-stress environments." *Id*. The Ninth Circuit held that the claimant's limited daily activities were not in tension with treating providers' opinions, and emphasized that a claimant "need not be completely incapacitated" in order to support a finding of disability. *Id*. (citation omitted).

Much the same can be said of the record before this Court. The Commissioner and ALJ place considerable emphasis on the fact that Gagnon takes walks late at night to go to the store or smoke, lived for a period of time in 2011 with his girlfriend and young daughter, worked on a part-time basis after the alleged onset date, tries to attend his son's school-related activities, and can perform yard work and housework, ride the bus, and sit in a waiting area. (*See* Tr. 23; Def.'s Br. at 6.) However, the record also reveals that: (1) Gagnon was not able to hold down even part-time employment, (2) Gagnon's sister had to ask Gagnon to move out of her house because she did not want to subject her "children to his everyday struggles," (3) Gagnon isolates himself from others and only engages in certain activities at times that allow him to avoid having any contact with the public, (4) mental

impairments, not physical impairments, are Gagnon's primary barrier to employment, (5) Gagnon "very, very rarely" rides the bus, and (6) Gagnon's long-term treating psychiatrist felt that his symptoms were "very close to a degree" that would necessitate hospitalization. (Tr. 41-42, 48, 50, 256, 272, 308.)

Based on the foregoing evidence, the Court concludes that the ALJ erred in discrediting Dr. Phelps' opinions on the basis of Gagnon's activities, because Gagnon's limited activities are consistent with the opinions offered by Dr. Phelps. *See Ghanim*, 763 F.3d at 1162 (reaching a similar conclusion). Since the errors discussed above deprive the ALJ's decision of the substantial evidence necessary for affirmance, the Commissioner's decision must be reversed and remanded.

## B.     RFC Determination

"An ALJ's RFC need only incorporate credible limitations supported by substantial evidence in the record and [it] must be consistent with the restrictions identified in the medical testimony." *Burke v. Comm'r of Soc. Sec.*, No. 13-1890, 2015 WL 769951, at *5 (D. Or. Feb. 23, 2015) (citation omitted). Here, the ALJ's RFC determination is not supported by substantial evidence because it fails to account for, and thus is not consistent with, the restrictions identified in Dr. Phelps' opinions. Of note, Dr. Phelps' mental residual functional capacity assessment indicates that Gagnon suffers from "severe limitations" (i.e., a limitation that precludes the person's ability to function in the designated area) in, among other things, the ability to maintain attention and concentration for extended periods, to accept instructions and respond appropriately to criticism from supervisors, and to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 386-88.) The ALJ's RFC determination fails to account for these limitations, which is confirmed by

the VE's testimony that a hypothetical worker with such limitations could not be gainfully employed. (Tr. 59.)

## C.    Remedy

"[T]he Ninth Circuit has held that, in social security cases, where the ALJ improperly discredited either a claimant or a treating physician's testimony, that 'it would be an abuse of discretion for a district court not to remand for an award of benefits when [certain] conditions are met.'" *Aparicio v. Colvin*, ---- F. App'x ---- , 2015 WL 9461608, at *3 (9th Cir. Dec. 28, 2015) (quoting *Garrison*, 759 F.3d at 1020). Specifically, a district court should remand for an award of benefits when the following "credit-as-true" criteria are met:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id*. Even if these criteria are met, however, "the court retains the 'flexibility' to remand for further proceedings where 'an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.'" *Id*.

In this case, the Commissioner opposes a remand for benefits solely on the ground that the record creates serious doubt as to whether Gagnon is, in fact, disabled. As support for her argument, the Commissioner relies on Gagnon's "disproportionate symptom allegations," the opinions of the non-examining state agency medical consultants, Gagnon's activities, and "the lack of objective findings supporting the alleged limitations." (Def.'s Br. at 10.) The Court is not persuaded by these arguments. As a treating psychiatrist, Dr. Phelps is presumptively entitled to deference under the Social Security regulations and Ninth Circuit precedent. *Garrison*, 759 F.3d at 1013. Affording such

deference to Dr. Phelps, the Court concludes that it does not have serious doubt about whether Gagnon is, in fact, disabled. Further, a holistic review of the record reveals that Dr. Phelps' opinions do not contradict his treatment notes or Gagnon's reported activities, and would support a finding of disability. Accordingly, a remand for an award of benefits is appropriate in the present case.[5]

## V. CONCLUSION

For the reasons stated, the Commissioner's decision is reversed and remanded for an award of benefits.

IT IS SO ORDERED.

Dated this 22nd day of June, 2016.

_Stacie F. Beckerman_
_____
STACIE F. BECKERMAN
United States Magistrate Judge

---

[5] The Court need not reach Gagnon's argument that the ALJ improperly discounted his testimony.

Page 22 - OPINION AND ORDER